IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SEAN FITZPATRICK, | ) | C.A. No. 3:21-cv-30108 |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BERKSHIRE HEALTH SYSTEMS, INC., | ) | |
|     Defendant. | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

PARTIES

1. Plaintiff, Sean Fitzpatrick, is a natural person over the age of eighteen who currently resides in Hatboro, Pennsylvania.

2. Defendant, Berkshire Health Systems, Inc., is a Massachusetts corporation with a principal place of business at 725 North Street, Pittsfield, MA 01201.  Defendant Berkshire Health Systems, Inc. ("BHS") owns and operates several hospitals in Western Massachusetts, including Berkshire Medical Center in Pittsfield and Fairview Hospital in Great Barrington.

JURISDICTION AND VENUE

3. Jurisdiction is proper because under 28 U.S.C. § 1331 because this civil action arises, at least in part, out of the laws of the United States.

4. Venue is proper because under 28 U.S.C. § 1391 a substantial part of the events or omissions giving rise to the claim occurred in the District of Massachusetts and a substantial part of property that is the subject of the action is situated in the District of Massachusetts.

FACTS

5. In the spring of 2020, BHS began to search for a new Chief Financial Officer.

6. The plaintiff, Mr. Fitzpatrick, was heavily recruited for the job by AMN Healthcare, a recruiter working on behalf of BHS.

7. Mr. Fitzpatrick has a long and distinguished history in the field of health care finance.  He is a licensed CPA and holds an MBA from St. Joseph's University in Pennsylvania.  From

1990-1997, Mr. Fitzpatrick worked for Graduate Health System where he received several promotions and eventually reached the title of Senior Accountant. In 1997 he worked as an Accounting Manager for the Philadelphia College of Osteopathic Medicine. From 1998-2010, Mr. Fitzpatrick worked as the Director of Accounting, Associate Vice President for Finance, and then Vice President for Finance at Thomas Jefferson University and Hospitals. In 2011 he worked as the System Vice President of Finance Operations for St. Vincent's Healthcare, which is part of a national healthcare system. From 2011-2014, he was the Executive Director of Financial Performance and then Area Finance Officer for Kaiser Permanente, another large integrated healthcare system located mostly in California. From 2014-2017, Mr. Fitzpatrick was the Chief Financial Officer of MetroWest Medical Center in Framingham. In 2017 he worked as the Senior Vice President and Chief Financial Officer for Jersey City Medical Center, and then in 2018 he worked as the System Vice President and Chief Financial Officer of Crozer Keystone Health System in Pennsylvania. In 2018, Mr. Fitzpatrick started his own consulting business, Sonor Consulting LLC.

8. Sonor Consulting catered to hospitals and healthcare systems and provided consulting services on a variety of healthcare financial and operational issues. Mr. Fitzpatrick ran the business from Pennsylvania, where he lived with his fiancée.

9. Mr. Fitzpatrick had a series of calls with BHS' recruiter throughout April and May 2020. These calls led to a series of video interviews in late May 2020 with David Phelps, President & CEO of BHS, Darlene Rodowicz, Executive Vice President and former Chief Financial Officer of BHS, and Patrick Borek, Vice President of Human Resources of BHS.

10. Following these video interviews, Mr. Fitzpatrick was selected as one of three finalists to come to BHS for in-person interviews. Mr. Fitzpatrick came to Pittsfield for two days in June 2020 where he underwent several in-person interviews, including more interviews with Mr. Phelps, Ms. Rodowicz, and Mr. Borek, met the rest of BHS' Executive Team, the CFO's direct reports, and two Board Members.

11. During these interviews and conversations, Mr. Fitzpatrick expressed repeatedly to several different people, including Mr. Phelps, Ms. Rodowicz, and Mr. Borek, that he wanted to stay in the BHS CFO position for at least 10-12 years to the date of his retirement (he was 52 years old at the time). He stated that if he were to relocate to Massachusetts and close his business, he wanted to make sure he was signing up for a long-term commitment and that if BHS did not take a similar view of the position, he was not interested. Everyone he told this to expressed the same desire as him and stated to him that they wanted a long-term CFO. Mr. Fitzpatrick was repeatedly told during the interview process that BHS had several system-wide financial and accounting issues it needed to address. Mr. Fitzpatrick was told by Mr. Phelps, Ms. Rodowicz, and others that

2

he would be joining BHS to change a culture that was "too nice" and unwilling to make the difficult and necessary changes to correct system-wide problems. When Mr. Fitzpatrick stated that he wanted to work at a hospital that valued ethics, integrity, and accountability, he was assured that these were precisely the sort of values embodied by BHS.

12. On June 19, 2020, Mr. Fitzpatrick was offered a position as the Chief Financial Officer ("CFO") of BHS. He was to be paid an annual salary with bonus eligibility and full benefits, including health insurance and employer-matched retirement benefits. He accepted the offer and relocated from Pennsylvania to Massachusetts.

13. Less than four months later, on October 5, 2020, Mr. Fitzpatrick was terminated in a "not-for-cause" termination. To date, despite numerous attempts, Mr. Fitzpatrick has been unable to obtain commensurate full-time employment. He has moved back to Pennsylvania and is working at a substantially reduced rate of pay.

14. Unbeknownst to Mr. Fitzpatrick and prior to his arrival at BHS, in or around 2018, the Office of Inspector General issued an audit report revealing an 85% error rate on Medicare bills submitted for Hyperbaric Oxygen Therapy ("HBOT") for the years 2013-2014.

15. This error rate is far in excess of expected and/or acceptable rates of error per industry standards and/or Medicare auditing, enforcement, and fraud prevention guidelines.

16. After the Inspector General's audit, BHS, with the assistance of McBee Associates, conducted internal audits of HBOT billing submitted to Medicare up through 2018. This audit revealed an error rate as high as 97%.

17. This error rate is far in excess of expected and/or acceptable rates of error per industry standards and/or Medicare auditing, enforcement, and fraud prevention guidelines.

18. BHS thereafter earmarked approximately $5 million ($5,000,000.00) dollars for anticipated Medicare reimbursements for overbilled HBOT care through 2018.

19. At or about the time of Mr. Fitzpatrick's termination, this money had not yet been disbursed to the government and the government did not yet know about BHS' internal audit results.

20. This dollar figure, and these error rates, were seriously troubling to Mr. Fitzpatrick, as they would have been to any competent CFO. Given the fact that almost every single HBOT bill submitted contained errors, Mr. Fitzpatrick was concerned that other

departments might have similar billing error rates, and repayments to correct these errors would be significantly more than the $5 million earmarked.

21. On September 24, 2020, at a meeting of the BHS Audit Committee, Mr. Fitzpatrick advised committee members that based on his education, training, and substantial experience in Medicare billing compliance the billing error rate on the small sampling of total services billed was indicative of, at best, systemic errors requiring more substantial repayments to the government, or, at worst, knowing under-reporting.

22. Mr. Fitzpatrick also advised that BHS administration had a duty and obligation to engage in an independent audit of billing across all departments to obtain a full and accurate accounting of monies owed to the government and to fix the errors that resulted in the erroneous billing,. Mr. Fitzpatrick recommended that Grant Thornton, BHS' independent audit firm, be commissioned to complete this task during its year-end audit process.

23. Executive Vice President (and former Chief Financial Officer) Darlene Rodowicz became upset at this, as she had been personally responsible for implementing and overseeing BHS billing practices over the time period in question.

24. This was not the only concern that Mr. Fitzpatrick had about billing practices. Mr. Fitzpatrick had previously advised Ms. Rodowicz, Brenda Cadorette (Chief Nursing Officer of Berkshire Medical Center), and Andrew Manzer (Chief Operating Officer of Berkshire Medical Center) on multiple occasions that Medicare patients were possibly being billed at an "inpatient" as opposed to an "observation" rate, which could mean that bills were inflated because "inpatient" bills at a higher rate. More specifically, Mr. Fitzpatrick noticed a sharp increase in "observation" billing right after his arrival and several meetings were held to attempt to understand why this was the case. Mr. Fitzpatrick feared that someone had been submitting inflated "inpatient" bills and was now submitting increased "observation" bills to try and fix it. Multiple meetings were held on this and Mr. Fitzpatrick never got a straight answer. He was terminated before there was a clear answer and solution.

25. Mr. Fitzpatrick had also previously informed Ms. Rodowicz and many others that adequate data collection systems were not in place at BHS and that it was necessary to put those systems in place to allow hospital finance and operations to function effectively. More specifically, BHS had implemented a billing system called Meditech Expanse just before Mr. Fitzpatrick started. There were numerous difficulties with the rollout of this system affecting accurate reporting of revenue. Department heads and finance leaders would complain that they were not receiving accurate or useful data out of this system. Separately, BHS' budget system (Kaufmann Hall) would produce reports that should have

4

been identical but contained different data, making it time consuming and difficult to assess the budget correctly.

26. Mr. Fitzpatrick had also become aware and was concerned about the disproportionate allocation of overhead costs to Fairview Hospital, which had resulted in additional Medicare reimbursements to that facility and had the effect of improving BHS' bottom line. Mr. Fitzpatrick raised these concerns with both Mr. Phelps and Ms. Rodowicz but that is as far as the issue ever went.

27. Approximately one week after the September 24, 2020 Audit Committee meeting, on October 1, 2020, and without any explanation whatsoever, Patrick Borek, BHS' Vice President of Human Resources, met with Mr. Fitzpatrick to discuss an "amicable separation." Mr. Fitzpatrick was shocked, as he had been doing exactly what he was hired to do and had been expressly told that BHS wanted him in this position for the long term. Specifically, as described above, during his interview process Mr. Fitzpatrick was told by Mr. Phelps, Ms. Rodowicz, and others that he was joining BHS to change a culture that was "too nice" and unwilling to make the difficult and necessary changes to correct system-wide problems. Mr. Fitzpatrick was told repeatedly by Mr. Phelps and others that he should "do the job he was hired to do." When Mr. Fitzpatrick asked Mr. Borek how things had come to this point so quickly, he was told, "it's not just Dave [Phelps], it's Darlene [Rodowicz]."

28. On September 25, 2020 (the day after the Audit Committee meeting), Mr. Fitzpatrick spoke on the telephone with Bart Raser, the Chair of the Finance Committee and the future Chair of the Board of Trustees. During this phone call, Mr. Raser stated it was his belief that Ms. Rodowicz was driving much of the hostility towards Mr. Fitzpatrick and his proposals. Mr. Raser also told Mr. Fitzpatrick he had "the full support of the Board to keep pushing" Mr. Phelps and Ms. Rodowicz.

29. Four days later, on October 5, 2020, Mr. Fitzpatrick received a letter of termination. The letter stated the termination was a "not-for-cause termination" and "an involuntary termination of employment without cause."

30. Up through his date of termination, Mr. Fitzpatrick had performed his job well and had never been subjected to any discipline or reprimands.

5

## COUNT I
## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3730(h)(1)

31. Plaintiff restates and realleges all prior paragraphs as if the same were set forth fully hereat.

32. Plaintiff was terminated by Defendant because of lawful and protected acts done by Plaintiff in furtherance of an action under 31 U.S.C. § 3730 or other efforts to stop one or more violations of 31 U.S.C. § 3730.

33. At all relevant times, Plaintiff harbored a good faith belief that Defendant was violating or was potentially violating 31 U.S.C. § 3730.

34. As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer damages, including back pay, front pay, emotional distress, and attorney's fees and costs.

WHEREFORE, the plaintiff demands judgment against the defendant for the above-described damages, plus double back pay, attorney's fees, interests, costs, and any other remedy this Court deems just and fair.

## COUNT II
## TERMINATION IN VIOLATION OF PUBLIC POLICY

35. Plaintiff restates and realleges all prior paragraphs as if the same were set forth fully hereat.

36. It is the public policy of the United States Government and the Commonwealth of Massachusetts to prohibit false claims for monies paid through public funds, such as Medicare or MassHealth.

37. It is the public policy of the United States Government and the Commonwealth of Massachusetts to protect employees who raise concerns that their employers are making false claims for monies paid through public funds.

38. Plaintiff was terminated in violation of these public policies.

39. As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer damages, including back pay, front pay, emotional distress, and attorney's fees and costs.

WHEREFORE, the plaintiff demands judgment against the defendant for the above-described damages, plus attorney's fees, interests, costs, and any other remedy this Court deems just and fair.

## COUNT III
## PROMISSORY ESTOPPEL

29. Plaintiff restates and realleges all prior paragraphs as if the same were set forth fully hereat.

31. Defendant made promises set out in this Complaint which it should have reasonably expected to induce action or forbearance of a definite and substantial character on the part of the Plaintiff.

32. In reliance on Defendant's promises, Plaintiff took certain action including but not limited to moving residences and ceasing operations of an ongoing business and has suffered damages as a result.

33. Injustice can be avoided only by enforcement of the promises.

WHEREFORE, the plaintiff demands judgment against the defendant for the above-described damages, plus attorney's fees, interests, costs, and any other remedy this Court deems just and fair.

## DEMAND FOR JURY TRIAL

The plaintiff demands a jury trial on all claims herein.

Respectfully submitted,
Sean Fitzpatrick,
By his attorneys,

/s/ Kathy Jo Cook
Kathy Jo Cook, BBO# 631389
kjcook@kjclawfirm.com
/s/ John T Martin
John T. Martin, BBO# 676344
jmartin@kjclawfirm.com
/s/ Benjamin H. Duggan
Benjamin H. Duggan, BBO# 684981
bduggan@kjclawfirm.com
KJC Law Firm, LLC
10 Tremont Street, 5th Floor
Boston, MA 02108
617-720-8447